**Opinion issued September 27, 2016**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-15-00778-CR

———————————

## WILBERT JOSEPH LEWIS, Appellant

## V.

## THE STATE OF TEXAS, Appellee

On Appeal from the 183rd District Court
Harris County, Texas
Trial Court Case No. 1426091

## MEMORANDUM OPINION

Wilbert Joseph Lewis was charged by indictment with aggravated robbery. He pleaded guilty without an agreement as to his punishment. A jury assessed his punishment at sixty years' imprisonment.  On appeal, Lewis contends that (1) the

trial court erred in denying his motion to suppress, and (2) his guilty plea was involuntary because he misunderstood the consequences of his plea. We affirm.

**BACKGROUND**

In August 2012, HPD officer E. Torres was driving through a Greenspoint apartment complex in his police cruiser. Torres frequently patrolled the complex, which he considered a center of crime within a high-crime neighborhood. He knew most of the residents, and made a habit of approaching and talking to anyone he did not recognize. Torres saw a young man whom he did not recognize walking across a private parking area. The man, who was sweaty and disheveled, carried a backpack and a metal box. Officer Torres parked his cruiser and was getting out to talk to the young man when he turned as if to run. Officer Torres stopped the man, telling him to "hold on a minute." The man identified himself as Wilbert Lewis. Because Lewis was significantly larger than Officer Torres, Torres decided to handcuff him. Torres told Lewis that this was for safety purposes and that he was not under arrest. Lewis said "okay" and put the backpack down at his feet. Torres placed the box Lewis was carrying on the trunk of the cruiser and cuffed him.

As Torres placed the box Lewis was carrying on the trunk of his cruiser, an older woman walked up to him and picked up the bag that Lewis had put on the ground. The woman, who was later identified as Lewis's aunt, asked angrily why the officer was detaining Lewis. Officer Torres later described her tone as "loud"

2

and "abusive." When Lewis's aunt attempted to leave with the bag, Torres ordered her to bring it back; Lewis's aunt complied. Officer Torres then asked Lewis if he could look in the bag and the box. Lewis, who was calm and cooperative, told Torres to go ahead. Torres found a cache of collectible coins in the box; in the bag, he found various identification and credit cards belonging to a white male named Martin Cuthbertson. When asked why he had Cuthbertson's credit cards and IDs, Lewis gave evasive answers, but eventually admitted he had stolen them.

Shortly after calling dispatch to book Lewis for a twenty-four-hour investigatory hold, Torres heard a report of an assault in the same apartment complex over his police radio. Patrol officer J. Calhoun had found Cuthbertson, the complainant, in his apartment, unconscious and bleeding profusely from multiple stab wounds. The ground floor apartment's sliding glass door had been smashed in. When Officer Torres told Calhoun over the radio that he had found a suspect in possession of Cuthbertson's IDs, Calhoun asked Torres to bring Lewis to the scene of the stabbing. Torres drove the short distance to Cuthbertson's apartment with Lewis handcuffed in the back seat of his cruiser. Upon arriving at the blood-soaked crime scene, Torres realized that the red stains he had noticed earlier on Lewis's shoes, socks, and shorts were Cuthbertson's blood. While Lewis was still in the back of Torres's cruiser, Calhoun asked him, "What's going on today?" Lewis responded, "Devil made me do it."

Officer Calhoun collected three knives: one from the scene that day, one from Lewis's bag, and one that was found in Cuthbertson's apartment several days later, hidden under a chair. Cuthbertson identified all three knives as coming from his apartment. The knife that was found several days later had blood on it.

Before trial, Lewis moved to suppress the fruits of his detention by Officer Torres. Lewis contended that Torres lacked reasonable suspicion to detain him in the apartment complex parking area. Lewis further contended that he did not voluntarily consent to the search of the bag. Before the hearing on Lewis's motion, the prosecutors recited on the record their plea offer of ten years' imprisonment, noting that if Lewis's motion were denied, the offer would increase to forty-five years. Lewis denied the State's offer, and the trial court denied his suppression motion. At the start of the trial, when he was arraigned before the jury, Lewis pleaded guilty, surprising the lawyers on both sides. The State's attorneys asked for a break. Lewis and his attorneys returned to Lewis's holding cell, where they conferred for a while.

After the defense lawyers spoke with Lewis in the holding cell, the judge recited outside the presence of the jury that Lewis had seemed agitated at counsel table with his lawyers, and that he was refusing to come back to the courtroom from his holding cell. She observed that Lewis was "not happy" that the State was holding to its offer of forty-five years, and that she could hear him yelling in his cell from

4

the bench. Lewis's counsel explained for the record that she and Lewis were "very clear" on the point that the State's offer of ten years would be gone after the suppression hearing. According to his counsel, Lewis was not interested in an offer of more than "two or five or six [years]" or something in that range. After the bailiffs brought Lewis back in, the judge explained to him that he could accept the State's offer of forty-five years or choose to be sentenced by the jury. Lewis's counsel explained that he had told Lewis in the holding cell that because he had pleaded guilty, the court would instruct the jury to find him guilty, and that the trial would be on punishment only. Lewis interjected:

> LEWIS: To be honest with you, I'm on heavy medication. You can look it up. I take medication. When I came Wednesday, Thursday, and Friday, while I'm coming for the pretrial, when you served these motions. When y'all offered me the ten, I thought I was going to go home Thursday or Friday when you granted the motion. I didn't understand about the ten and 45 years. I thought if I went to trial for the 45, I got a deal of 45 years, you know, and go home with it.

> THE COURT: That's right. And you can.

> LEWIS: If I'd known I would have took the ten. Because what if the Supreme Court don't grant the motion? I say I'd do 7 or 2-and-a-half, I'm saying, but I wasn't in my right mind. I was on medication.

> THE COURT: Well, it sounds like, I mean, you are in your right mind. And you know exactly what's going on.

Lewis's counsel tried again to explain to Lewis that the trial was now about his punishment, that he could still take the State's offer of forty-five years, and that he

5

could still appeal the trial court's denial of his suppression motion. Lewis interrupted repeatedly to complain that he didn't understand and that the court and his lawyers were "going to give it to him anyway." The prosecutor explained to Lewis that while the State was offering forty-five years, the jury could sentence him to life. Lewis responded, "Whatever they going to do, they going to do. I might as well — I mean, I'm not going to be out in the world anyway. . . . I'm not going to take 45. I'm 23. I'm not going to take 45 years, sir."

In the punishment proceeding, Cuthbertson testified that had come home from his job as an air conditioning repairman for lunch. A man he didn't recognize then stepped out of his kitchen, hit him over the head with a pipe wrench, and stabbed him repeatedly. Cuthbertson identified the driver's license and credit cards that Officer Torres recovered as Cuthbertson's property. Cuthbertson also identified the three knives as having come from his apartment.

The State also called Officers Torres and Calhoun, who described their apprehension of Lewis and investigation of the aggravated robbery. Officer Christopher Duncan, a crime scene investigator and blood splatter analyst, averred that the bloodstains on Lewis's clothing were spatter from blows, or transferred from other intimate contact consistent with Lewis being present at the stabbing. Officer Aaron Rodriguez testified that he collected swabs of DNA from Lewis's mouth after

6

his arrest. Finally, the State presented expert testimony that the blood on Lewis's clothing and the blood-stained knife matched Cuthbertson's DNA.

The State also introduced evidence of Lewis's prior convictions and misconduct in jail while awaiting trial. Lewis renewed his motion to suppress, but presented no evidence in his defense. The jury returned a guilty verdict as instructed by the jury charge, and assessed punishment at sixty years. After trial, the court adopted the State's proposed findings of fact and conclusions of law on Lewis's motion to suppress.

## DISCUSSION

### I. Voluntariness of Guilty Plea

Lewis contends that his guilty plea was involuntary because the trial court failed to admonish him as to the consequences of pleading guilty; in particular, he contends that he misunderstood the punishment range available to him and to the jury in the event that he pleaded guilty without an agreed recommendation.

According to the Code of Criminal Procedure, the trial court may not accept a guilty plea unless it appears that the defendant is mentally competent and entered the plea freely and voluntarily. TEX. CODE CRIM. PROC. ANN. art. 26.13(b) (West 2009 & Supp. 2016). If a defendant is properly admonished before entering his plea, a prima facie showing is established that the plea was entered knowingly and voluntarily. *Martinez v. State*, 981 S.W.2d 195, 197 (Tex. Crim. App. 1998); *Rios*

*v. State*, 377 S.W.3d 131, 136 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd). A trial court's admonishment is sufficient if it substantially complies with the statutory requirements unless "the defendant affirmatively shows that he was not aware of the consequences of his plea and that he was misled or harmed by the admonishment of the court." TEX. CODE CRIM. PROC. ANN. art. 26.13(c). The burden then shifts to the defendant to show that he pleaded guilty without understanding the consequences of his plea and that he suffered harm as a result. *Martinez*, 981 S.W.2d at 197; *Rios*, 377 S.W.3d at 136. If a court completely fails to give a statutorily-required admonishment, it commits non-constitutional error, which we examine for harm under Texas Rule of Appellate Procedure 44.2(b). *Ducker v. State*, 45 S.W.3d 791, 795 (Tex. App.—Dallas 2001, no pet.) (citing *Carranza v. State*, 980 S.W.2d 653, 655–56 (Tex. Crim. App. 1998) *and Cain v. State*, 947 S.W.2d 262, 263–64 (Tex. Crim. App. 1997)). In assessing the voluntariness of the defendant's guilty plea, we consider the entire record. *Martinez*, 981 S.W.2d at 197; *Rios*, 377 S.W.3d at 136. A defendant's guilty plea is voluntary if he understood the plea's direct consequences. *State v. Collazo*, 264 S.W.3d 121, 127 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd) (citing *Jimenez v. State*, 987 S.W.2d 886, 888 (Tex. Crim. App. 1999)).

Lewis argues that he misunderstood the range of punishment available if he pleaded guilty. The trial court informed Lewis, however, of the range of punishment

8

at the pre-trial arraignment hearing and again before the hearing on Lewis's motion to suppress. Later, at Lewis's arraignment before the jury, the State reiterated that the jury could sentence Lewis to life imprisonment. Lewis was therefore admonished in compliance with article 26.13(a)'s first requirement. *See* TEX. CODE CRIM. PROC. ANN. art. 26.13(a).

Lewis's attorney recited on the record that he had discussed the State's plea offer "extensively" with Lewis, and that he had explained to Lewis that once he pleaded guilty, the trial court would instruct the jury to find him guilty and the sole issue would be his punishment. The trial court explained that Lewis was free to accept the State's offer of 45 years' imprisonment or proceed to jury sentencing.

Lewis argues, as he did in the trial court, that he had expected to win on his suppression motion, and that if he lost, he thought the offer of 45 years would remain open. The trial judge confirmed that this was the case. Lewis acknowledged his understanding of these facts when he declined to accept the 45 years and opted to have the jury assess his punishment. Because the record shows that Lewis understood the range of punishment available to the jury, we hold that his has failed to demonstrate that his guilty plea was involuntary on this basis. *See* TEX. R. APP. P. 44.2(b); *Carranza*, 980 S.W.2d at 655–56; *Jimenez*, 987 S.W.2d at 888; *Ducker*, 45 S.W.3d at 795.

Lewis also contends that his guilty plea was unconstitutional because it wasn't entered knowingly and voluntarily, citing *Boykin v. Alabama*. 395 U.S. 238, 244, 89 S. Ct. 1709, 1712–13 (1969). In that case, the United States Supreme Court considered whether a trial court could accept a defendant's guilty plea when the record was silent as to whether the plea was entered voluntarily and knowingly. *Id.* at 240–41, 89 S. Ct. at 1711. The Court held that the record must establish the voluntariness of the defendant's guilty plea. *Id.* at 243–44, 89 S. Ct. at 1712–13. It reasoned that because a guilty plea is a waiver of constitutional rights and the prerequisites of a valid waiver must be "spread on the record," a silent record would not support a guilty plea. *Id.* According to *Boykin*, before accepting a guilty plea, courts must ensure that criminal defendants have "a full understanding of what the plea connotes and of its consequence." *Id.* at 243–44, 89 S. Ct. at 1712.

*Boykin*, however, does not require "the equivalent of the Article 26.13(a) admonishments" for due process to be satisfied. *Davison v. State*, 405 S.W.3d 682, 687 (Tex. Crim. App. 2013) (quoting *Gardner v. State*, 164 S.W.3d 393, 399 (Tex. Crim. App. 2005)). As the court observed, "[s]o long as the record *otherwise* affirmatively discloses that the defendant's guilty plea was adequately informed, due process is satisfied." *Id.* As discussed above, the record in this case establishes Lewis's understanding that by pleading guilty, he would surrender the right to a jury trial on his guilt and subject himself to the full range of punishment for the

10

aggravated robbery charges against him.  Accordingly, the trial court's acceptance of his guilty plea does not offend due process.  *See Boykin*, 395 U.S. at 244, 89 S. Ct. at 1712–13; *Davison*, 405 S.W.3d at 687; *Gardner*, 164 S.W.3d at 399.

## II.    Motion to Suppress

Lewis further contends that the trial court erred in denying his motion to suppress.  He argues that his initial detention by Officer Torres was not supported by a reasonable suspicion.  In the alternative, he urges that his consent to Officer Torres's search of his bag was not voluntary.

## A.    Standard of Review and Applicable Law

We review a ruling on a motion to suppress under a bifurcated standard. *Turrubiate v. State*, 399 S.W.3d 147, 150 (Tex. Crim. App. 2013); *Shepherd v. State*, 273 S.W.3d 681, 684 (Tex. Crim. App. 2008).  We review a trial court's factual findings for abuse of discretion and its application of the law to the facts de novo. *Neal v. State*, 256 S.W.3d 264, 281 (Tex. Crim. App. 2008).  We defer to a trial court's determination of historical facts, especially those based on an evaluation of a witness's credibility or demeanor.  *Turrubiate*, 399 S.W.3d at 150.  We apply the same deference to review mixed questions of law and fact.  *Id.*  However, when mixed questions of law and fact do not depend on the evaluation of credibility and demeanor, we review the trial judge's ruling de novo.  *State v. Kerwick*, 393 S.W.3d 270, 273 (Tex. Crim. App. 2013).  Whether the facts known to a police officer at the

11

time of a detention amount to a reasonable suspicion is such a question, reviewed de novo on appeal. *See id.* When, as in this case, the trial court makes findings of fact and conclusions of law, we will uphold the trial court's ruling if it is "reasonably supported by the record and is correct on any theory of law applicable to the case." *Turrubiate*, 399 S.W.3d at 150 (citing *Valtierra v. State*, 310 S.W.3d 442, 447–48 (Tex. Crim. App. 2010)); *Maxwell v. State*, 73 S.W.3d 278, 281 (Tex. Crim. App. 2002); *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000).

*Initial encounter and detention*

"Law enforcement and citizens engage in three distinct types of interactions: (1) consensual encounters; (2) investigatory detentions; and (3) arrests." *State v. Woodard*, 341 S.W.3d 404, 410–411 (Tex. Crim. App. 2011) (first citing *Florida v. Bostick*, 501 U.S. 429, 434, 111 S. Ct. 2382, 2386 (1991); then citing *Gerstein v. Pugh*, 420 U.S. 103, 111–12, 95 S. Ct. 854, 862 (1975); and then citing *Terry v. Ohio*, 392 U.S. 1, 30–31, 88 S. Ct. 1868, 1884–85 (1968)). Consensual police-citizen encounters do not implicate Fourth Amendment protections. *Id.* at 411 (citing *Bostick*, 501 U.S. at 434, 111 S. Ct. at 2386). In contrast, if there is a detention, the detaining officer must have reasonable suspicion that the person "is, has been, or soon will be, engaged in criminal activity." *Id.* (citing *Florida v. Rodriguez*, 469 U.S. 1, 5–6, 105 S. Ct. 308, 310–11 (1984)).

We consider the "totality of the circumstances surrounding the interaction to determine whether a reasonable person in the defendant's shoes would have felt free to ignore [a police officer's] request or terminate the interaction." *Id.* (citing *Brendlin v. California*, 551 U.S. 249, 255, 127 S. Ct. 2400, 2405–06 (2007)). Although we consider "[t]he surrounding circumstances, including time and place, . . . the officer's conduct is the most important factor" in deciding whether an encounter between a citizen and a police officer was consensual or a Fourth Amendment seizure. *Id.* (citing *State v. Garcia-Cantu*, 253 S.W.3d 236, 244 (Tex. Crim. App. 2008)). "[W]hen an officer through force or a showing of authority restrains a citizen's liberty, the encounter is no longer consensual." *Id.* (citing *Brendlin*, 551 U.S. at 254, 127 S. Ct. at 2405).

To support a reasonable suspicion that a person is, has been, or soon will be engaged in criminal activity, an officer must have "specific, articulable facts . . . combined with rational inferences from those facts." *Derichsweiler v. State*, 348 S.W.3d 906, 914 (Tex. Crim. App. 2011) (first citing *United States v. Sokolow*, 490 U.S. 1, 7, 109 S. Ct. 1581, 1585 (1989); and then citing *Crain v. State*, 315 S.W.3d 43, 52 (Tex. Crim. App. 2010)). We examine the reasonableness of a temporary investigative detention in light of the totality of the circumstances to determine whether an officer had an objectively justifiable basis for the detention. *Derichsweiler*, 348 S.W.3d at 914 (first citing *Terry*, 392 U.S. at 21–22, 88 S. Ct. at

13

1880; and then citing *United States v. Cortez*, 449 U.S. 411, 417–18, 101 S. Ct. 690, 695 (1981)); *Balentine v. State*, 71 S.W.3d 763, 768 (Tex. Crim. App. 2002) (citing *Woods v. State*, 956 S.W.2d 33, 38 (Tex. Crim. App. 1997)). Reasonable suspicion may exist even if the conduct of the person detained is "as consistent with innocent activity as with criminal activity." *York v. State*, 342 S.W.3d 528, 536 (Tex. Crim. App. 2011) (quoting *Curtis v. State*, 238 S.W.3d 376, 378–79 (Tex. Crim. App. 2007)).

*Consent to Search*

Consent is among the most well-established exceptions to the presumption that a warrantless search is unreasonable. *Johnson v. State*, 226 S.W.3d 439, 443 (Tex. Crim. App. 2007); *see Brown v. State*, 212 S.W.3d 851, 868 (Tex. App.— Houston [1st Dist.] 2006, pet. ref'd). For such a consent to be valid, however, it must be voluntary. *See Rayford v. State*, 125 S.W.3d 521, 528 (Tex. Crim. App. 2003) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219–23, 93 S. Ct. 2041, 2043–46 (1973)); *see also Brimage v. State*, 918 S.W.2d 466, 480 (Tex. Crim. App. 1994) ("When the State has secured the voluntary consent to a warrantless search, such a search violates neither the United States or Texas constitutions, nor the laws of this state.") (citing *United States v. Matlock*, 415 U.S. 164, 94 S. Ct. 988 (1974); *Becknell v. State*, 720 S.W.2d 526 (Tex. Crim. App. 1986); *Sharp v. State*, 707 S.W.2d 611 (Tex. Crim. App. 1986)). Generally, "whether consent is voluntary

turns on questions of fact and is determined from the totality of the circumstances."

*Rodriguez v. State*, 313 S.W.3d 403, 406 (Tex. App.—Houston [1st Dist.] 2009, no pet.); *see Rayford*, 125 S.W.3d at 528 (citing *Ohio v. Robinette*, 519 U.S. 33, 40, 117 S. Ct. 417, 421 (1996)); *Maxwell v. State*, 73 S.W.3d 278, 281 (Tex. Crim. App. 2002). "The ultimate question is whether the persons's 'will has been overborne and his capacity for self-determination critically impaired'" such that his consent must have been involuntary. *Fienen v. State*, 390 S.W.3d 328, 333 (Tex. Crim. App. 2012) (quoting *Schneckloth*, 412 U.S. at 225–26, 93 S. Ct. at 2047)). In conducting this inquiry, we may consider: (1) the defendant's age, education, and intelligence; (2) the length of the detention; (3) any constitutional advice given to the defendant; (4) the repetitiveness of questioning; (5) the use of physical punishment; (6) whether the defendant was arrested, handcuffed, or in custody; (7) whether *Miranda* warnings were given; and (8) whether the defendant had the option to refuse to consent. *Cisneros v. State*, 290 S.W.3d 457, 464 (Tex. App.—Houston [14th Dist.] 2009, pet. dism'd) (citing *Reasor v. State*, 12 S.W.3d 813, 818 (Tex. Crim. App. 2000) and *Flores v. State*, 172 S.W.3d 742, 749–50 (Tex. App.—Houston [14th Dist.] 2005, no pet.)).

**B.    Analysis**

In its findings of fact and conclusions of law, the trial court found that Officer Torres's interactions with Lewis were a consensual encounter. In the alternative, the

trial court found that Officer Torres stopped Lewis on reasonable suspicion of trespassing.

The trial court found that Officer Torres was in his marked cruiser in the apartment parking lot, which was marked with "no trespassing" signs. Torres, who regularly patrolled the area, knew most of the apartment complex's inhabitants. Because it was a high-crime area, he made a habit of talking to anyone he didn't recognize. Torres, whom the trial court found credible and truthful, saw Lewis walking across the parking lot. Lewis was sweaty, his clothes were in disarray, and he was carrying a heavy-looking bag in one hand and a metal box in the other. Since Torres did not recognize Lewis as a resident of the apartment complex, he stopped his cruiser and got out to speak with him. Torres did not turn on his lights or siren. The trial court found from Torres's testimony that Lewis turned and made a move that led Torres to believe that Lewis was about to run.

Lewis was free to terminate the encounter and leave until Officer Torres ordered him not to run and handcuffed him. The initial encounter, therefore, was consensual up to that point, and no reasonable suspicion was required. *See Woodard*, 341 S.W.3d at 411 ("Courts consider the totality of the circumstances surrounding the interaction to determine whether a reasonable person in the defendant's shoes would feel free to ignore the request or terminate the encounter.").

We uphold Officer Torres's further investigative detention of Lewis if he had a reasonable suspicion that Lewis was engaged in criminal activity based on the information known to him at that time. *See id.* Torres encountered Lewis in an apartment complex particularly known for high crime within a high-crime neighborhood. *See Illinois v. Wardlow*, 528 U.S. 119, 123, 120 S. Ct. 673, 676–77 (2000) ("[W]e have previously noted the fact that the stop occurred in a 'high crime area' among the relevant contextual considerations in a *Terry* analysis."). He did not recognize Lewis despite knowing most of the residents there. Lewis was in a parking lot that was private property and was posted with "no trespassing" signs. Further, as Lewis came closer, Torres noticed that Lewis was sweaty and disheveled, and that he was carrying a box and a heavy-looking bag. When Torres got out of his car, Lewis turned and made a move as if to flee.

Mere presence in a high-crime area is not enough to justify an investigatory detention. *See Wardlow*, 528 U.S. at 124, 120 S. Ct. at 676. Location coupled with other circumstances may, however, support a finding of reasonable suspicion when combined with other suspicious circumstances, such as a suspect's unprovoked flight from a police officer. *See id.* ("[I]t was not merely respondent's presence in an area of heavy narcotics trafficking that aroused the officers' suspicion, but his unprovoked flight upon noticing the police. Our cases have also recognized that nervous, evasive behavior is a pertinent factor in determining reasonable

17

suspicion."). Lewis's movements suggesting flight, when combined with Officer Torres's other observations, were sufficient to justify Torres's detention of Lewis. *See Wardlow*, 528 U.S. at 124, 120 S. Ct. at 676; *York*, 342, S.W.3d at 536; *Woodard*, 341 S.W.3d at 411–12; *Derichsweiler*, 348 S.W.3d at 914.

Finally, Lewis contends that he did not voluntarily consent to have Torres search his bag. To have standing to challenge a search, however, a defendant must show: (1) that he had an actual, subjective expectation of privacy in the item to be searched, and (2) that society is prepared to recognize this subjective expectation of privacy as reasonable. *Smith v. Maryland*, 442 U.S. 735, 740–41, 99 S. Ct. 2577, 2580 (1979). In *Pennywell v. State*, we held that a defendant had no standing to challenge a search of a stolen bag. 84 S.W.3d 841, 844 (Tex. App.—Houston [1st Dist.] 2002), *pet. granted*, 125 S.W.3d 472 (Tex. Crim. App. 2003).[1] We analogized to *Hughes v. State*, in which the Court of Criminal Appeals held that a defendant had no reasonable expectation of privacy in the contents of a stolen car. 897 S.W.2d 285, 305 (Tex. Crim. App. 1994). In this case, the complainant testified that the bag

---

[1] The Court of Criminal Appeals subsequently granted Pennywell's petition for review on the ground that we should have considered the constitutionality of the detention preceding the search of the stolen bag. *See Pennywell v. State*, 125 S.W.3d 472 (Tex. Crim. App. 2003). The high court did not disturb our holding that Pennywell lacked standing to challenge the search of the bag, but merely directed us to consider Pennywell's argument as a threshold issue. *Id.* On remand, we held that the detention was reasonable and affirmed the trial court without reconsidering our disposition of the standing issue. *Pennywell v. State*, 127 S.W.3d 149, 153–54 (Tex. App.—Houston [1st Dist.] 2003, no pet.).

was owned by his son and that it had been in his apartment before the robbery. Because the complainant's uncontradicted testimony shows that the bag was stolen, Lewis cannot challenge Officer Torres's search. *See Hughes*, 897 S.W.2d at 305; *Pennywell*, 84 S.W.3d at 844.

Further, according to the account given by Officer Torres, whom the trial court deemed to be credible and reliable, the encounter between Torres and Lewis was brief and polite. Torres asked almost immediately if he could look in the bag. Lewis, who was calm and cooperative, told Torres to "go ahead." Torres did not ask multiple times for consent or otherwise pressure Lewis. Lewis observes that he was handcuffed at the time he gave consent and that he was not warned of his right to refuse consent to search. We note, however, that neither of these circumstances make a suspect's consent involuntary, absent other factors which, when considered together, overpower the person's will. *See Schneckloth*, 412 U.S. at 225–26, 93 S. Ct. at 2047. Based on our examination of the encounter as a whole, in light of the factors discussed in *Reasor* and *Schneckloth*, we hold that the State carried its burden to prove that Lewis consented voluntarily. *Schneckloth*, 412 U.S. at 225–26, 93 S. Ct. at 2047; *Reasor*, 12 S.W.3d at 818; *see Rayford*, 125 S.W.3d at 528; *Cisneros*, 290 S.W.3d at 464.

## CONCLUSION

The trial court did not err in overruling Lewis's motion to suppress or accepting his guilty plea. We therefore affirm the judgment of the trial court.


Jane Bland
Justice

Panel consists of Justices Bland, Massengale, and Lloyd.

Do not publish. TEX. R. APP. P. 47.2(b).